IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JIMMY FORD                 PLAINTIFF

VS.                    NO. 3:99CV435 BN

WENTON WALKER, SR., BARRIE
McARTHUR AND
DIVERSIFIED TECHNOLOGY, INC.          DEFENDANTS

## COMPLAINT
## JURY TRIAL DEMANDED

COMES NOW Jimmy Ford, and files this Complaint against Diversified Technology, Inc., Wenton Walker, Sr. and Barrie McArthur.:

### I. Parties

1. Jimmy Ford is an adult resident of Rankin County, Mississippi, and is presently 60 years of age.

2. Diversified Technology, Inc. ("DTI") is a Mississippi Corporation whose agent for service of process is Kathryn W. Stone, 2829 Lakeland Drive, Flowood, Mississippi.

3. Wenton Walker, Sr. is an adult resident citizen of Mississippi who may be served with process at 476 Highland Colony Parkway, Ridgeland, Mississippi.

4. Barrie McArthur is an adult resident citizen of Mississippi who may be served with process at 476 Highland Colony Parkway, Ridgeland, Mississippi.

## II. Federal Jurisdiction

5. Jurisdiction is vested in the United States District Court pursuant to 28 U.S.C. Section 1331 (Federal Question Jurisdiction) and 42 U.S.C. Section 2000 et seq. All jurisdictional and statutory prerequisites to this filing have been satisfied.

6. Defendants' flagrant disregard for the requirements of Title VII are not limited to their treatment of Ford. Defendants have failed to follow EEOC regulations with respect to posting and notification of employees rights, have made comments in open meetings that certain black employees attention to their work might be enhanced by placing a box of fried chicken on their desk, and otherwise failed to provide a discrimination-free workplace environment. Defendants' treatment of Ford are simply another manifestation of Defendants' failure to provide a workplace that is free from unlawful discrimination, harassment, intimidation, racial insensitivity and outright animus.

## III. Factual Background

7. Jimmy Ford has been an employee of Diversified Technology, Inc. for approximately fourteen years. During that time, he has served in a number of key management positions. Most recently, prior to the incident which is the basis of this Complaint, Ford served as head of Personnel and Facility Management, and also served as acting head of the Mechanical Engineering and Shop Divisions of DTI.

8. Ford's compensation package for 1998 exceeded one hundred seventy thousand dollars.

9. As recently as January 23, 1999, Wenton Walker, Sr. (acting in his capacity as President of DTI) noted in Ford's annual personnel evaluation that:

> "Jimmy continues to demonstrate his commitment to the company through not only putting in extra time, but also through making an effort to provide leadership at critical times.... He is one of the staff members the undersigned [Walker] can count on.... This dependency is valued as a result of other Senior staff members not providing this element of company loyalty.... Jimmy continues to be responsive to the needs of the company.... I am glad he is on our Key Management Team.
>
> W. Walker
> President"

10. DTI is a closely held corporation, with ownership mainly held or controlled by Wenton Walker, Sr., Les Lampton and Barrie McArthur. Mr. Lampton also controls Ergon, Inc., and uses that entity to provide certain necessary services, including legal services, to DTI.

11. In April of 1999, DTI was in the middle of a sexual harassment investigation as a result of a complaint filed with the Equal Employment Opportunity Commission by a female employee, Lindy Martin.

12. On April 19, 1999, Louis Watson (Ergon's legal counsel) and Lance Maserov (Ergon's Personnel Director) came to meet with DTI employees and explain the interview procedures that would be utilized by EEOC investigators on the following day, April 20.

13. It was then that DTI learned for the first time that the allegations were primarily directed against Wenton Walker, Jr. (hereafter "Junior"), son of the DTI president. Walker was advised of this. Walker, who was scheduled to be out of town during the EEOC interviews, advised Ford to "do the best we can with the interviews and to be honest."

14. During the pre-interview discussions and EEOC interviews on April 19-20, the following allegations were discussed:

(A) Junior had Lindy Martin give him back rubs as a "friendly gesture" in the production line area;

(B) Junior removed his shirt in the employee's break area and had Lindy Martin administer "Nair" to his hairy back;

(C) Junior had requested information regarding Martin's sexual activities;

(D) Junior had requested Martin perform an act of oral sex on him; and

(E) Junior had maintained sexually explicit pictures on his office computer, and had called Martin into his office to show her the images.

15. Junior became very angry and defensive about these allegations, especially when Watson explained the possibility that Martin might file suit against Junior personally. Watson explained that such litigation was usually covered by homeowners insurance. Junior was particularly defensive about the allegation of pornography, stating that it was nobody's business what was on his computer.

16. Junior had a history of preferential treatment within the company, and received compensation far in excess of comparable employees.

17. At 6:00 a.m. the following morning, April 21, Ford received a furious phone call form Walker, who said that Junior had called him and advised him that Ford, Watson and Maserov were out to "get" Junior and had talked to Junior "like a dog."

18. Ford attempted to explain that Junior's complaints were not accurate, but Walker became more angry and told Ford that he should have his "ass kicked." Walker then stated he would "handle" Ford, Watson and Maserov when he returned to the office, and then he hung up.

19. Later that morning, Lampton called Ford to speak to him about the investigation, and Ford advised Lampton of Walker's threats. Lampton assured Ford that there would be no retaliation.

20. Walker learned that Lampton had called Ford, and immediately called Ford to advise Ford that he would "get what was coming to him."

21. When Walker returned from his business trip, he immediately began a campaign of silence and exclusion against Ford, which interfered with Ford's ability to carry out his duties. Walker ignored multiple requests from Ford for a meeting.

22. On April 27, when Ford made a personal appeal for a meeting, Walker accused Ford of lying about his son and told Ford that he (Walker) did not want to be around Ford, Lampton or Maserov.

23. Since Walker would not permit Ford access to the minimum information necessary for Ford to perform his job, Ford called Lampton for assistance. Lampton sympathized and indicated he had never seen a son dominate his father as Junior did Walker. Lampton said he was afraid Walker might be having a nervous breakdown, and asked Ford to hang on.

24. On Friday, May 14, 1999, Walker called Ford into his office and stripped him of his duties pertaining to the Mechanical Engineering Division, the Metal Fabrication shop, Invoice Approval, Human Resources and Administration. Ford was advised that he would perform limited Personnel Functions, but would no longer be allowed to coordinate functions with Ergon Legal or Personnel departments. Ford was advised that he would handle low-level supervision and manual labor tasks. Ford was advised to vacate his office.

25. Ford called Maserov to report these changes, as Lampton had earlier requested. Lampton called Ford later that day and advised Ford to "hang in there" and give Lampton time to work things out.

26. Ford arrived for work on Monday, May 17, and reported to Barrie McArthur, DTI shareholder and Walker's second-in-command. At 6:50 a.m. McArthur called Ford in and berated him because Lampton had called McArthur the afternoon of Friday, May 14, to discuss the situation, which had made McArthur late in leaving for a weekend trip to the coast. McArthur said that he and Lampton had discussed Ford's age, and said they intended to get a "younger man" for personnel activities. McArthur told Ford that Lampton did not want to hear from Ford anymore. McArthur told Ford that he was also to perform maintenance/manual labor activities.

27. On Thursday, May 20, McArthur advised Ford that Ford was stripped of all personnel duties, and would work on maintenance full-time.

28. Ford subsequently filed a complaint with the Equal Employment Opportunity Commission and obtained a right-to-sue authorization.

29. On June 1, 1999, the undersigned counsel for Ford transmitted a letter to DTI and Walker, advising the recipients of Ford's EEOC complaints with respect to unlawful retaliatory activities and other related claims. Shortly thereafter, Ford was reinstated to his personnel management position, although he remained stripped of his policy-making "staff" position and was not provided with equivalent office space.

30. In subsequent conversations with Ford, Lampton and Walker blamed each other for Ford's demotion, harassment and humiliation.

### IV. Retaliation

31. The allegations contained in all foregoing paragraphs are incorporated into this section.

32. The actions of DTI, Wenton Walker, Sr. as President of DTI, and Barrie McArthur as Vice-President of DTI, as described above, constitute retaliation against Jimmy Ford as a result of his participation in and legally required cooperation with the investigation of the Equal Employment Opportunity Commission in it's investigation concerning the allegedly inappropriate activities of Wenton Walker, Jr., son of the President.

33. Such retaliation is a violation of federal law, and Ford is entitled to reasonable compensation as a result of the retaliatory actions which were taken against him, including but not limited to public embarrassment and humiliation, demotion, verbal abuse, deprivation of office facilities.

### V. Age Discrimination

34. The allegations contained in all foregoing paragraphs are incorporated into this section.

35. Based on the remarks of Barrie McArthur, Vice-President and representative of DTI and McArthur's report of his conversation with Lampton, DTI's actions were also the result of discrimination against Ford as a result of his age.

36. Discrimination on the basis of age is a violation of federal law, and Ford is entitled to reasonable compensation from DTI and McArthur for damages he has suffered as a result of age discrimination.

## VI. Intentional Infliction of Emotional Distress

37. The allegations contained in all foregoing paragraphs are incorporated into this section.

38. Walker's and McArthur's actions against Ford, including but not limited to verbal abuse, interference with Ford's abilities to carry out his workplace duties and demotion of Ford, constitute the state law claim of intentional infliction of mental and emotional distress.

39. As a result of this intentional infliction of mental and emotional distress, Ford is entitled to reasonable compensation from Walker and McArthur for damages he has sustained.

40. DTI is liable for the actions of Walker and McArthur under the doctrine of *Respondeat Superior.*

## VII. Unlawful Job Action under State Law

41. The allegations contained in all foregoing paragraphs are incorporated into this section.

42. Although Mississippi is traditionally an employment-at-will jurisdiction, there are certain reasons which may not serve as the basis of firing or other punitive job actions. One of these reasons is the refusal of an employee to commit an illegal act.

43. Walker's and McArthur's job actions taken against Ford are a direct and immediate result of Ford's refusal to impede or in any way conceal relevant facts from Equal Employment Opportunity Commission investigators conducting a lawful investigation. Ford had a legal duty to cooperate and participate in said investigation, and had in fact been directed by Walker to do so.

44. Ford's demotion, and workplace harassment, constitutes an unlawful job action under Mississippi law for refusal to commit an illegal act.

45. As a result of Ford's demotion for refusal to commit an illegal act, Ford is entitled to recover reasonable compensation from Walker, McArthur and DTI.

### VIII. Attempted Constructive Discharge

46. The allegations contained in all foregoing paragraphs are incorporated into this section.

47. The actions of Walker, McArthur and DTI toward Ford were calculated and intended to force Ford to resign from his employment with DTI. This pattern of intentional harassment constituted attempted constructive discharge by DTI as a result of Ford refusing to commit an illegal act by concealing pertinent information from EEOC investigators.

48. As a result of Ford's attempted constructive discharge by DTI, Ford is entitled to recover reasonable damages from all defendants.

### IX. Punitive Damages

49. The allegations contained in all foregoing paragraphs are incorporated into this section.

50. The willful, intentional and malicious manner in which Walker, McArthur and DTI carried out their pattern of harassment and unlawful job actions against Ford justify imposition of punitive damages under state law as well as the maximum unliquidated damages permitted pursuant to federal law for Title VII offenses.

## X. Damages

51. The allegations contained in all foregoing paragraphs are incorporated into this section.

52. As a result of the willful, intentional and malicious conduct of Walker, McArthur and DTI, Ford has suffered mental and emotional anguish, a decline in his physical health and a serious impairment of future earnings.

THEREFORE, PREMISES CONSIDERED, Ford demands the following relief:

1. Three million dollars in compensatory damages;

2. Seven million dollars in punitive damages; and

3. Such other relief as may be just and proper under the circumstances, including but not limited to costs involved in bringing this action and an award of attorney's fees.

Respectfully submitted,

**JIMMY FORD**

By: _____
His Attorney

Stephen W. Rimmer, MSB #5363
John Hedglin, MSB #2179
Rimmer, Rawlings, MacInnis & Hedglin, P.A.
1290 Deposit Guaranty Plaza
210 East Capitol Street
Jackson, Mississippi 39201-2302
Telephone:   (601) 969-1030
Telecopier:  (601) 969-1041